CROUSE *v.* MICHELL.

1. LANDLORD AND TENANT—COVENANT NOT TO ASSIGN—MORTGAGE OF LEASE.

    A covenant in a lease not to assign without the consent of the lessor is not broken by an assignment of the lease as security for a debt.

2. ESTATE FOR YEARS—SALE ON EXECUTION.

    The common-law rule that leases of land should be sold on execution in the same manner as personal property was changed by statute in 1879, 3 Comp. Laws, §§ 9226–9231, directing the same proceedings as in case of sales of real estate.

3. LEASE FOR YEARS—RECORDING.

    A lease of lands for more than three years is a conveyance of such an interest in real estate that a mortgage of the lease should be recorded in the office of the register of deeds, and not as a chattel mortgage.

4. ASSIGNMENTS OF LEASE—PRIORITY.

    As between two unrecorded assignments of a lease, the one first executed has priority.

Appeal from Wayne; Waite, J. Submitted November 13, 1901. (Docket No. 48.) Decided April 22, 1902.

Bill by Henry P. Crouse and Edward D. Brandegee, copartners as Crouse & Brandegee, against Carl H. Michell, Edward H. Parker, administrator of the estate of Thomas A. Parker, deceased, Albert Ives, Sr., Albert Ives, Jr., and Butler Ives, copartners as A. Ives & Sons, Henry A. Harmon, trustee in bankruptcy of said firm, and the Macdonald Clothing Company, to foreclose a lien upon a leasehold interest. From a decree for complainants, all of the defendants except Michell appeal. Affirmed.

*Stevenson & Butzel,* for complainants.

*Walker & Spalding,* for appellants.

MOORE, J. This is a bill filed by the assignees of a lease to have it sold in satisfaction of the lessee's indebtedness to them secured by the assignment. The circuit judge granted a decree according to the prayer of the bill of complaint. The case is brought here by appeal.

The terms of the lease as to assignments and transfers of the lessee's interest without the consent of the lessor will be referred to later. The complainants' assignment was not consented to by the lessor. The main question in the case is on the validity of this transfer, without consent, against a subsequent transfer, made with the lessor's consent. The defendants are the personal representative of Mr. Parker, the lessor; Mr. Michell, the lessee; the members of the firm of A. Ives & Sons, bankers, to whom the assignment with consent was made by Mr. Michell; Mr. Harmon, the trustee in bankruptcy of Ives & Sons; and the Macdonald Clothing Company, who hold from Ives & Sons a sublease for substantially the unexpired term of the lease. The lease is of a store building at the corner of State street and Woodward avenue, Detroit, and was made by Mr. Parker, party of the first part, to Mr. Michell, party of the second part, for a term of 15 years, commencing February 1, 1895. The material provisions of the lease are as follows: "That all understandings or agreements made between the said above parties are to be void unless in writing; that the party of the second part will not assign nor transfer this lease, or sublet said premises, or any part thereof, without the written consent of said party of the first part." In an earlier part of the lease it is "provided that, in case any rent shall be due and unpaid, or if default shall be made in any of the covenants herein contained, then it shall be lawful for the said party of the first part, his certain attorney, heirs, representatives, and assigns, to re-enter and repossess the said premises, and the said party of the second part, and each and every other occupant, to remove and put out."

On August 2, 1897, Mr. Michell, who was engaged in both the clothing and grocery business, organized a cor-

poration to conduct the clothing business, under the name of the C. H. Michell Company, in which he held nearly all the stock. This company carried on this business in the premises covered by the lease from its organization until October, 1899, when it suspended business, and its stock was sold out and removed. Mr. Michell also organized a corporation under the name of the Michell Table-Supply Company, to carry on the grocery business, in which he held nearly all the stock. This company occupied a portion of the premises in question from October, 1897, until shortly before the building was sublet by the defendants Ives to the Macdonald Clothing Company, in March, 1900. There was no written agreement between Michell and either of these corporations regarding their occupation of the Parker premises, except it was understood at the time of the organization of the Clothing Company that it was to occupy and stay in that store. During the business existence of the Clothing Company, the rent of the premises was paid to Parker by its checks. Mr. Parker receipted for this rent in each case to Mr. Michell individually. He knew that the two corporations were in occupancy. It does not appear that he knew anything of the terms on which they occupied. He also knew that large sums of money were expended by these two companies to fit the premises for their business.

The complainants sold large quantities of merchandise to C. H. Michell and to the C. H. Michell Company. On the 2d of August, 1897, Michell, or the C. H. Michell Company, was indebted to the complainants in the sum of $20,000, or thereabouts, and the Michell interests desired to make arrangements for an extension of time for the payment of the $20,000 for three years, and also to provide for the purchase on credit of additional goods from the complainants, and to secure them the payment of the debt then due, and also to secure them the payment of such future indebtedness as should accrue from time to time by the further sale of goods to the C. H. Michell Company. On the 2d day of August, 1897, C. H. Michell

delivered to the complainants, through Elliott G. Stevenson, a power of attorney. It provided that Stevenson could and should execute an assignment of the lease in question to Crouse & Brandegee whenever desired by them, "as security for the payment of any indebtedness owing by the said Carl H. Michell or the said C. H. Michell Company to said Crouse & Brandegee," and Stevenson was given all the power and authority that Michell had himself in the premises. The power conferred upon Stevenson, to use the language of the assignment itself, "is conferred for the purpose of authorizing and empowering him to execute an assignment of the lease,    *   *   * together with all rights and interests of the said Michell under the same, to be held and used by the said Crouse & Brandegee as security for the payment of any sum of money that said C. H. Michell shall owe to the said Crouse & Brandegee." On the same day the original lease was delivered by Michell to the complainants herein, through their attorney and agent, Elliott G. Stevenson, and this original lease, from that day to this, has never been out of the control and possession of the complainants.

In March, 1898, Mr. Stevenson, under this power of attorney, assigned and conveyed to the complainants the lease, and all Michell's rights and privileges thereunder, to secure the indebtedness contemplated by the power of attorney. This was not recorded, nor was it filed as a chattel mortgage. On October 10, 1898, Mr. Stevenson notified Mr. Michell of the assignment. On October 16, 1899, after the rights claimed by and under Ives & Sons in the lease had accrued, if they had any thereunder, and their assignment had been delivered to them, and they had taken possession under it, Mr. Stevenson gave written notice to Mr. Parker and to Ives & Sons that an assignment of the lease had been made by Michell to the complainants in March, 1898. On October 27, 1899, Mr. Parker, by letter, replied to Mr. Stevenson's notice, saying that he had no previous knowledge of the transfer to Crouse & Brandegee; that, under the terms of the lease,

it could not be assigned without his written consent; that he had not consented to this assignment; and, further, "I do not now consent to it, and will in no way recognize it." It is not claimed that Mr. Parker had any previous notice or knowledge of the complainants' interests.

The defendants Ives & Sons were the bankers for the Table-Supply Company from its organization, and loaned it money from time to time. On August 9, 1899, this indebtedness amounted to $46,201.77, represented by five interest-bearing demand notes, indorsed by C. H. Michell, aggregating $20,000, and by an overdraft for the remainder made up of advances previously made from time to time. None of this indebtedness was contracted before December, 1898. On August 7, 1899, Mr. Don M. Dickinson, who was counsel for the Table-Supply Company, after examining statements of their condition, which they furnished, and at their request, asked Ives & Sons to make them further advances, representing that this would, in his judgment, enable the company to pull through, and that the Parker lease, which the Iveses knew to be valuable, would be assigned to secure the existing debt and future advances. To this proposition Ives & Sons agreed, and upon the strength of it forebore on the existing debt, and made further advances from time to time, the amount on October 14, 1899, being $6,416.01. On September 23d, in pursuance of this verbal understanding, a written permission was obtained from Mr. Parker, allowing Mr. Michell to sublet the premises for the unexpired period of the lease to Ives & Sons, and allowing Ives & Sons to sublet them to "such person or persons, firm, or corporation as they may elect; said premises to be occupied, however, by said Ives & Sons or their subtenants subject to and in accordance with all the requirements" of the original lease. It further stated that it should not be construed as a general waiver of the provisions of the lease relating to assignment and subletting, but to give permission to sublet only to the persons and in the manner in the permission provided.

On October 11, 1899, Mr. Michell executed to Ives & Sons an assignment of all his right, title, and interest in the lease to secure the advances made in pursuance of the agreement of August 9th with Mr. Dickinson, and all notes indorsed by him and discounted by Ives & Sons for the benefit of the Table-Supply Company, and such further advances as might be thereafter made. This assignment and Mr. Parker's assent were delivered to Ives & Sons on October 14th. On October 16th they took possession of the leased premises, suffering the Table-Supply Company to continue therein until shortly before the transfer to the Macdonald Clothing Company. It is claimed that up to this time Ives & Sons had no notice of the transfer to the complainants, or that they had any claim on the lease. On the day following their taking possession they received notice from Mr. Stevenson, as already stated. At the time when Ives & Sons took possession there was some rent in arrears to Parker. This, under the terms of his consent, it was necessary for them to pay. They paid it, and further rent accruing up to the time of the transfer to the Macdonald Clothing Company; in all, $7,850.73. In March, 1900, Ives & Sons sublet the premises to the Macdonald Clothing Company for substantially the remaining term of the lease, the Clothing Company paying therefor the sum of $31,700, and undertaking to carry out the lessee's obligations under the lease and the conditions of the Parker consent.

It is claimed by complainants that the value of the lease over and above the rental it called for was $38,497.76. The defendants claim this amount is simply the present worth of the difference between the rental named in the lease and the rental offered by Mr. Stevenson, payable in monthly installments, for the unexpired term of the lease, on a 5 per cent. basis; and that the amount realized from the lease by Ives & Sons, after deducting the amount of the rent which they had paid, was $23,849.27, which was $2,566.74 less than the amount of their demand paper, plus the advances between August 9th and October 14th.

The complainants claim: That the pledge or assignment of the lease as security in good faith was not in violation of the covenant not to assign or sublet. That, even if the pledge were a violation of the covenant, Mr. Parker has waived the same by his conduct after knowledge of the breach on the part of Michell. That, as between complainants and the Iveses, the complainants are entitled to piority, because their assignment was first in point of time, and neither of the conveyances has ever been recorded; because the Iveses were informed of the prior assignment to these complainants; because the Iveses did not change their position any between the time of getting the actual assignment of the lease, on October 14th, and the receipt of written notice of the complainants' assignment, on October 17th; because an oral pledge of a leasehold interest of 15 years' duration is, under statute in this State, void, and no rights can be acquired as against a prior assignee of such leasehold interest by one who relies upon a verbal assurance of future assignment.

The defendants contend that the assignment to complainants is invalid as a violation of the terms of the lease, and cannot be enforced; that there has been no waiver of the provisions of the lease by the lessor; that the covenant of the lease against assignments and transfers without the lessor's consent is a continuing covenant, and that a court of equity will not enforce an assignment made without consent in violation of the covenant; that the Ives assignment was taken without notice of complainants' claim, and for value; that as the complainants' assignment, being security upon a chattel real, was not filed as a chattel mortgage, it must, even if otherwise valid, be postponed to the Ives assignment.

The first question demanding attention is whether the assignment or pledge of the lease in question as security in good faith was a violation of the clause against assignment. The case of *Riggs* v. *Pursell*, 66 N. Y. 199, is in point. The following language is contained in the opinion:

"The lease contained a covenant on the part of the lessee that he would not, during the term, assign, transfer, or set over the lease, or any of the term thereby created; and the purchasers claim that this .covenant was violated, and the lease forfeited, by the giving of the mortgage, which was foreclosed. Their objection is based upon the giving of the mortgage; not that there was a forfeiture by the sale under the mortgage. * * * The giving of the mortgage was not a violation of the covenant. A mortgage, in this State, of land, is not a transfer of the legal title or the possession, but a mere security. * * * It has been held in several cases in England that such a covenant is not violated by a delivery of the lease as a security for money loaned, and yet such a delivery operates as an equitable mortgage of the term created by the lease. 1 Taylor, Landl. & T. (2d Ed.) § 406; 2 Platt, Leases, 258; *Pitt* v. *Hogg*, 4 Dowl. & R. 226; *Goodbehere* v. *Bevan*, 3 Maule & S. 353. In *Pitt* v. *Hogg* there was a covenant 'not to let, set, assign, transfer, set over, or otherwise part with the premises demised in the lease' of a coffee house. The lessee deposited the lease with a brewer as security for beer supplied to the house, and it was held that the covenant was not violated. Abbott, C. J., said: 'I am clearly of opinion that the effect of the covenant is only to restrain the lessee from completely alienating the legal interest in the premises to the prejudice of the landlord, without his consent in writing.' In *Goodbehere* v. *Bevan* there was a similar covenant, and the lessee deposited his lease as a security for money borrowed, and became bankrupt, and the lease was sold under the direction of the chancellor to pay that debt, and it was held that the lease was not forfeited. It is, therefore, clear that this lease was not forfeited by the giving of the mortgage, which did not transfer the title to the premises or the lease. Neither was it forfeited by the sale under the decree. This was a judicial sale in a hostile proceeding, a sale *in invitum*, and such sales are held not to violate this covenant. An assignment, either by the lessee or his executor, which is not voluntary, but caused by operation of law, is not a breach of the covenant not to assign. Where a lessee who had so covenanted gave a warrant of attorney to confess a judgment, on which the lease was taken in execution and sold, it was considered no breach of the covenant, all the proceedings being in

good faith. *Mitchinson* v. *Carter*, 8 Term R. 57. See, also, *Jackson* v. *Corliss*, 7 Johns. 531; *Jackson* v. *Silvernail*, 15 Johns. 278; *Smith* v. *Putnam*, 3 Pick. 221. Such covenants are restraints which courts do not favor. They are construed with the utmost jealousy, and very easy modes have always been countenanced for defeating them. *Church* v. *Brown*, 15 Ves. 265; *Crusoe* v. *Bugby*, 2 W. Bl. 766; 1 Taylor, Landl. & T. (2d Ed.) §§ 402, 403; 2 Platt, Leases, 250. This covenant, therefore, furnishes no ground for the relief of the purchasers."

The same question was involved in *Croft* v. *Lumley*, 6 H. L. Cas. 672. In that case 10 different opinions were written, all reaching the same result. We quote from Baron Watson:

"In answer to the second question, I am of opinion that the special case does not disclose any breach of the covenant not to charge or incumber the theater, or any part thereof. The covenant in question is: [His lordship read it.] In order to support this breach, the case states that Lumley granted several warrants of attorney to several persons for debts due and owing from him, and more especially one to Hughes, in the defeasance to which it was expressed to be a collateral security for a debt, and with a provision that the expense of registering the judgment should be borne by Lumley.

"The nature and effect of a warrant of attorney are well known. Warrants of attorney are generally given where the party, having no defense to an action for debt, authorizes an attorney to confess judgment in order to save expense. The warrant of attorney is no charge on the land. The judgment signed in pursuance of the warrant of attorney may affect a leasehold interest like this in two ways: *First*, by means of an execution, by which the lease might be taken and sold under a writ of *fieri facias;* and, *secondly*, by registering the judgment in the proper office, and, when registered, the judgment would become an equitable charge under Stat. 1 & 2 Vict. chap. 110, § 13; and by registering a memorial thereof at the Middlesex registry the judgment would obtain priority over any charges or judgments subsequently registered at that registry.

"I think that this covenant applies only to charges and incumbrances directly or immediately made by the lessee,

as the covenant is not that the lessee shall not do any act whereby the lease should be sold or incumbered. It by no means follows that the person for whose benefit the warrant of attorney is given may ever enter up judgment thereon, or, if judgment be entered up, that he may register the same so as to charge the lease. It could not be argued that contracting a debt which the defendant was unable to pay, although that might produce a judgment, and a charge on the lease, could be a charging or incumbering within the meaning of the covenant. Such breach is to be without the will or consent of the lessor; and it could hardly be said that the consent to enter up judgment or register is a consent contemplated by the covenant. I think, therefore, the case as to this breach falls within the principle of *Mitchinson* v. *Carter*, and that no breach of that covenant has been occasioned by the facts stated in the special case."

See, also, 18 Am. & Eng. Enc. Law (2d Ed.), p. 661.

There are authorities the other way, but we think the weight of authority is as stated in *Riggs* v. *Pursell*. Having reached this conclusion, it is not necessary to discuss the question of waiver. This brings us to the next question: Which of these mortgages has priority? It is claimed by defendants the question is determined by the rule applicable to chattel mortgages. It is said the leasehold interest is a chattel real (section 8787, 3 Comp. Laws), and, when sold on execution, must be sold as personal estate (*Buhl* v. *Kenyon*, 11 Mich. 249 [83 Am. Dec. 738]), and can only be seized on execution as a chattel interest (*Grover* v. *Fox*, 36 Mich. 459); that, as the assignment was not filed with the city clerk, it is void as to defendants,—citing section 9523, 3 Comp. Laws. On the other hand, it is claimed that, as this lease ran for more than three years, it created an interest in real estate, and brings it under the recording laws applicable to real estate.

The case of *Buhl* v. *Kenyon* was decided in 1863. The case of *Grover* v. *Fox* was decided in 1877. In 1879 an act was passed prescribing the manner of selling leasehold interests in lands on execution. 3 Comp. Laws, §§ 9226–9231. It provides that the manner of levy and notice of

sale shall be the same as in case of levy on real estate. It also provides, if sale is made, if the unexpired term of the lease exceeds three years, the same kind of a conveyance shall be executed as in case of a sale of real estate, and also gives a year within which to redeem. Section 9511, 3 Comp. Laws, reads:

"Every contract for the leasing for a longer period than one year, or for the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized by writing."

Section 8994, chap. 241, 3 Comp. Laws, reads:

"The term 'conveyance,' as used in this chapter, shall be construed to embrace every instrument in writing by which any estate or interest in real estate is created, aliened, mortgaged, or assigned, or by which the title to any real estate may be affected in law or equity, except wills, leases for a term not exceeding three years, and executory contracts for the sale or purchase of lands."

Section 8988 of the same chapter reads as follows:

"Every conveyance of real estate within this State, hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith, and for a valuable consideration, of the same real estate, or any portion thereof, whose conveyance shall be first duly recorded."

Taking all these provisions of law and construing them together, we think it clear that this lease, which had eight or ten years to run, was such a conveyance of an interest in lands as to make the real-estate recording laws applicable to it.

As before stated, neither of the assignments has ever been recorded, unless the filing of the *lis pendens* at the time of the commencement of this suit may be regarded as a recording of the assignment. This, then, being the situation, the general rule that, as between two unrecorded conveyances, the one first made has priority, applies. It

is stated in 1 Jones, Mortg. § 607, as follows: "As between several unrecorded mortgages or other conveyances, that of prior execution takes precedence." In 20 Am. & Eng. Enc. Law (1st Ed.), p. 592, it is said:

"WITH CONVEYANCE FIRST RECORDED. Recordation is required for the protection of subsequent purchasers only. To require a subsequent conveyance of title to be recorded in order that a prior purchaser of the same property may be able to obtain information of its existence would not be in furtherance of the general design of these statutes, which was to protect purchasers from being undone by prior secret conveyances, by making the means of obtaining information thereof available to that end. And so it is not necessary to his full protection, in the absence of statutory provisions so requiring, that the subsequent purchaser record the instrument under which he claims before the recordation of the conveyance of the prior purchaser. But, although such requirement may not be in full accord with the general design of the recording provisions, from a desire to secure a prompt record of conveyances, and to afford a means for the ready determination of certain questions of priority which would otherwise arise, the protection of the recording acts is limited in most of the States to a purchaser whose deed or conveyance is first duly recorded. This requirement must be complied with in order to support the claim of the subsequent purchaser to the protection afforded by the recording acts,"—citing many cases.

The decree of the court below is affirmed, with costs.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.