WENTWORTH v PROCESS INSTALLATIONS, INC

Docket No. 56176. Submitted October 8, 1982, at Grand Rapids.— Decided January 19, 1983. Leave to appeal applied for.

Theodore O. Wentworth and Shirley M. Wentworth, his wife, brought a tenancy proceeding in 86th District Court contesting the right of Process Installations, Inc., assignee of Vulcan-Cincinnati, Inc., to possess a 14-acre plot of land located near Northport, Michigan. The suit was removed to Leelanau Circuit Court, William R. Brown, J., when Process Installations and Vulcan-Cincinnati raised an equitable defense.

In 1962, the property was leased to Chemical Processes of Ohio, Inc., a company owned by Theodore Wentworth and his brothers, which had been created by Wentworth and his brothers to develop chemical processes for another company owned by them, Vulcan-Cincinnati. Wentworth had borrowed money, using the property as security, which he turned over to Vulcan-Cincinnati for the development of the Northport property. The 1962 lease was for ten years with nominal consideration of $12 per year. Theodore Wentworth went into semi-retirement in 1964. In 1966, Wentworth took over the operation of Vulcan-Cincinnati when the company was pressed by mounting debts. Vulcan-Cincinnati was merged with Chemical Processes. In order to keep creditors from instituting bankruptcy proceedings, Wentworth and his wife personally guaranteed a $913,413 debenture issue by Vulcan-Cincinnati.

The financial difficulties of Vulcan-Cincinnati continued. In 1970, Wentworth entered into an agreement with Allstates

REFERENCES FOR POINTS IN HEADNOTES
[1] 41 Am Jur 2d, Husband and Wife §§ 60, 232 *et seq.*
[2, 3] 49 Am Jur 2d, Landlord and Tenant §§ 7, 8.
  Lease of realty for term of years as subject of chattel mortgage. 33 ALR2d 1277.
[4] 49 Am Jur 2d, Landlord and Tenant §§ 398, 405, 421 *et seq.*
[5, 7, 8] 35 Am Jur 2d, Fixtures §§ 39, 40, 89, 90.
  What constitutes improvements, alterations, or additions within provisions of lease permitting or prohibiting tenant's removal thereof at termination of lease. 30 ALR3d 998.
[6, 8] 35 Am Jur 2d, Fixtures § 3.

Design and Development Company. Pursuant to a number of agreements, Allstates received 51% of the outstanding Vulcan-Cincinnati stock with Wentworth retaining 35% of the stock. Wentworth received $10,000 for his relinquished stock and continued as chief executive officer of Vulcan-Cincinnati with a salary increase. The Wentworth debenture guarantee was cancelled and Allstates made a loan to Vulcan-Cincinnati to cover operating expenses. Wentworth agreed to execute a new ten-year lease covering the Northport property with Vulcan-Cincinnati as lessee. Pursuant to that agreement Wentworth executed a lease with his name as lessor and Vulcan-Cincinnati as lessee. While Shirley Wentworth signed the agreement which resulted in the 1970 lease, she did not sign the 1970 lease itself.

In 1972, Vulcan-Cincinnati found it was in need of additional funds. Vulcan-Cincinnati received a $300,000 loan from First Capital Corporation of Boston, a wholly owned subsidiary of First National Bank of Boston. In return for the loan, First Capital, with First National operating as its agent, received a five-year promissory note, a stock purchase warrant, and a security agreement naming all of Vulcan-Cincinnati's assets, both real and personal, as collateral. In 1973, additional refinancing occurred with Allstates and First Capital acting as co-guarantors of approximately $295,000 in loans. The financial woes of Vulcan-Cincinnati continued. In May of 1975, with Vulcan-Cincinnati's employees terminated because of insufficient funds to meet the payroll and the loan from First Capital in default, First National Bank stepped in and took possession of Vulcan-Cincinnati's assets. The bank, as agent for all secured parties, secured an offer for Vulcan-Cincinnati's assets from Process Installations, Inc. The bank, Vulcan-Cincinnati, and Allstates entered into an agreement with Process Installations whereby the latter purchased all the assets of Vulcan-Cincinnati for $75,000. Both the bank and Vulcan-Cincinnati assigned to Process Installations the 1970 lease covering the Northport property. Process Installations sent to Wentworth a notice to exercise the option to purchase contained in the lease.

The Wentworths then commenced in district court the action to recover possession of the Northport property on the basis of default, nonpayment, and the lack of a valid assignment of the lease. The action was removed to circuit court when the defendants sought an injunction ordering the Wentworths to recognize the assignment and the right of the defendants to exercise the option to purchase. The issues framed in the trial court were: (1) whether the failure of Shirley Wentworth to sign the 1970 lease rendered that lease void; (2) if the 1970 lease was

not void, whether the failure to secure the consent of the Wentworths to the assignment in accordance with the nonassignment provision of the lease rendered the assignment of the lease to Process Installations void; and (3) if the assignment of the lease was proper, whether the price pursuant to the option in the lease to purchase the property for fair market value included the value of the improvements to the property, including several buildings which had been built during the term of the 1962 lease.

The trial court, William R. Beam, J., concluded that the 1970 lease was valid, that the lease was effectively assigned by operation of law or, in the alternative, that the actions of Wentworth under the circumstances acted as consent to assignment, and that the fair market value under the option to purchase included the value of the buildings constructed by Vulcan-Cincinnati in the 1960's. Defendants appealed. Plaintiffs cross-appealed. *Held:*

1. The facts establish an adequate basis to conclude that Theodore Wentworth, in signing the 1970 lease, was acting as the general agent for his wife, Shirley Wentworth. The 1970 lease, accordingly, was valid even in the absence of the signature of Shirley Wentworth.

2. Since the unexpired term of the 1970 lease under Michigan law constituted real property, the nonassignment provision of the lease could only be effected by a proper foreclosure on the security instrument. Since the bank failed to properly foreclose on its security instrument, the assignment of the 1970 lease to Process Installations was not valid.

3. The buildings built by Vulcan-Cincinnati in the 1960's are business fixtures. Since the lessee under the 1962 lease and the 1970 lease remained the same, Vulcan-Cincinnati retained the right to remove those fixtures. Accordingly, the fair market value under the option to purchase provision of the 1970 lease does not include the value of those buildings.

Reversed and remanded.

1. CONTRACTS — REAL PROPERTY — LEASES — HUSBAND AND WIFE — AGENCY.

A woman may be bound by the terms of a commercial lease of property owned by the entirety with her husband even though the woman does not sign the lease where the woman left the management of the property to her husband and signed other documents giving rise to the lease transaction, since under such circumstances the husband can be found to be acting as the general agent for his wife.

2. CONTRACTS — REAL PROPERTY — LEASES — PERSONALTY.

A leasehold interest which has an unexpired term which exceeds three years, for the purpose of recording laws and levy procedures, is treated as being real rather than personal property (MCL 565.35, 600.6057; MSA 26.552, 27A.6057).

3. CONTRACTS — REAL PROPERTY — LEASES — PERSONALTY — COMMON LAW.

Leasehold interests, at common law, were identified as a chattel real and considered to be personal property; however, in Michigan, leasehold interests are classified as real property.

4. CONTRACTS — REAL PROPERTY — LEASES — ASSIGNMENT OF LEASES.

The assignment by a creditor of a lessor of a leasehold interest being held as security for an overdue loan of the lessor is not valid where the lease provides that there shall be no assignment of the lease without the consent of the lessor, no such consent is obtained, and there was no effective foreclosure on the security instrument.

5. FIXTURES — TRADE FIXTURES — REMOVAL OF TRADE FIXTURES.

A trade fixture is a fixture which has been annexed to leased realty by a lessee for the purpose of enabling him to engage in a business; a trade fixture may be removed by the lessee and is characterized as personalty with respect to the lessee's right of removal.

6. FIXTURES — TRADE FIXTURES — REMOVAL OF TRADE FIXTURES — PUBLIC POLICY.

The right of a tenant to remove erections made by him in furtherance of the purpose for which the premises were leased is founded upon public policy and has its foundation in the interest which society has that every person shall be encouraged to make the most beneficial use of his property under the circumstances.

7. FIXTURES — TRADE FIXTURES — PERSONALTY — UNJUST ENRICHMENT.

The rule that a tenant's erections for purposes of trade proposed to be carried on in the premises leased are treated as personalty where the landlord has contributed nothing toward the cost of construction of those erections is based on the fact that otherwise there would be an unjust enrichment of the landlord at the expense of his tenant.

8. Fixtures — Trade Fixtures — Removal of Trade Fixtures.

   Trade fixtures remain the personal property of the lessee as long
   as the lessee remains in legitimate possession of the property
   unless: (1) it is expressed or clearly implied in a subsequent
   lease, executed after the term in which the fixtures were
   erected, that the fixtures belong to the leasehold, or (2) such a
   fundamental change in the nature of the tenancy has occurred
   that it would not unjustly enrich the lessor to include the
   fixtures as a permanent part of his real property.

*Running, Wise & Wilson* (by *Patrick J. Wilson),*
for plaintiffs.

*Murchie, Calcutt & Sondee* (by *Harry Calcutt)*
and *Taft, Settinius & Hollister* (by *Robert G. Sta-
chler* and *W. Stuart Dornette),* of counsel, for
defendants.

Before: R. B. Burns, P.J., and MacKenzie and
T. L. Brown,* JJ.

R. B. Burns, P.J. Defendants appeal a May 15,
1980, circuit court judgment ruling that the build-
ings and fixtures located on plaintiffs' property are
to be included in assessing the fair market value
of the property for the purpose of the exercise of
the option to purchase contained in the lease held
by defendant Process Installations, Inc., an as-
signee of defendant Vulcan-Cincinnati, Inc. Plain-
tiffs have filed a delayed cross-appeal, challenging
an August 8, 1977, determination of the trial court
declaring that defendant Process Installations,
Inc., had a right to continued possession of plain-
tiffs' property under the terms of the lease dated
June 23, 1970.

Plaintiffs initiated this suit as a tenancy pro-
ceeding in district court, contesting Process Instal-

* Circuit judge, sitting on the Court of Appeals by assignment.

lations' right to possession of a 14-acre plot of land located near the Village of Northport and owned by plaintiffs. Defendants pled an equitable defense, causing the matter to be removed to circuit court. The property at issue in this case (hereinafter referred to as the Northport property) consists of the acreage and three buildings: a boiler, a storage facility, and a plant for the production of a catalyst used in the manufacture of industrial grade methanol.

The facts out of which this suit arose are extensive and complicated. This case basically resulted from the continuing financial difficulties of the chemical plant which was originally owned by plaintiff Theodore Wentworth and two of his brothers.

Wentworth and his brothers owned an Ohio-based firm, Vulcan-Cincinnati, in equal shares. In the early 1960's, they agreed that Theodore would form a second corporation, Chemical Processes of Ohio, Inc., to manage the Northport operations.

The essence of the scheme contemplated by the Wentworth brothers was that Chemical Processes would develop processes for the exclusive benefit of Vulcan-Cincinnati. To facilitate construction of the catalyst plant, Wentworth borrowed $160,000 from the Michigan National Bank, secured by a mortgage on the Northport property. This money was turned over to Vulcan-Cincinnati, which used it, along with funds of its own, to develop the property. Vulcan-Cincinnati made the mortgage payments. On January 1, 1962, a lease was executed between Theodore Wentworth as lessor and Chemical Processes of Ohio, Inc., as lessee. This lease, which will be discussed more thoroughly below, covered a term of ten years and was granted for the nominal consideration of $12 per year. The

lease was drafted by Theodore Wentworth's attorney.

Theodore Wentworth went into semi-retirement in 1964. Returning from California in 1966, he found the company $1.2 million in debt. Wentworth took over the operation of Vulcan-Cincinnati, which then merged with Chemical Processes, Inc.

In 1966, a committee composed of the principal creditors of Vulcan-Cincinnati was formed in an effort to resolve the problems posed by the corporation's indebtedness. One of these creditors was Allstates Design and Development Company, a firm that was later to figure prominently in events relevant to this litigation. While Wentworth was able to convince the creditors' committee not to proceed with bankruptcy proceedings, the committee required as an alternative that Wentworth sign a debenture issue and that he and Shirley Wentworth personally guarantee the debentures. The debenture issue was executed on July 1, 1967, and represented $903,413 in indebtedness. Unfortunately, Vulcan-Cincinnati's financial problems continued.

In 1970, with Vulcan-Cincinnati insolvent, Wentworth began searching for a fresh source of working capital. As a result, an agreement was made between Allstates and Vulcan-Cincinnati during June of 1970. A number of documents of greater or lesser significance were executed during that month; the essential elements of the agreement were as follows:

1. Allstates received 51% of the outstanding Vulcan-Cincinnati stock. Theodore Wentworth retained 35% of that stock. Allstates also received the right to elect four of the seven directors of Vulcan-Cincinnati.

2. Theodore Wentworth received $10,000 for his relinquished shares of stock. Wentworth continued as the chief executive officer of Vulcan-Cincinnati and was granted a salary increase. The agreement also resulted in the cancellation of the Wentworths' debenture guarantee.

3. Vulcan-Cincinnati received a loan from Allstates to cover its operating requirements.

4. Wentworth was to execute a new ten-year lease covering the Northport property, with Vulcan-Cincinnati as lessee. According to the testimony of an officer of Allstates, the execution of a new lease was central to this agreement as far as Allstates was concerned.

Pursuant to this agreement, a lease was prepared naming Wentworth as lessor and Vulcan-Cincinnati as lessee by Conrad Magrish, Vulcan-Cincinnati's attorney. Although Shirley Wentworth signed the agreement between Allstates and Vulcan-Cincinnati, her name does not appear on the 1970 lease.

In 1971, with Vulcan-Cincinnati continuing to operate at a deficit, Wentworth sought financing from the First National Bank of Boston. In 1972, an agreement was executed between Vulcan-Cincinnati, the First National Bank of Boston (hereinafter bank), and the First Capital Corporation of Boston, a wholly owned subsidiary of the bank. Vulcan-Cincinnati received a $300,000 loan from First Capital; in return, First Capital received a five-year promissory note and a stock purchase warrant. A security agreement was made as between Vulcan-Cincinnati and the bank, acting as agent for First Capital. Significantly, all assets of Vulcan-Cincinnati, real and personal, were pledged as collateral. In the wake of this agreement, Vulcan-Cincinnati was solvent until the spring of

1973. Thereafter two attempts at refinancing occurred, with First Capital and Allstates acting as co-guarantors of approximately $295,000 in loans.

In May of 1975, things looked bad for Vulcan-Cincinnati. The corporation owed Allstates approximately $1.1 million and owed $850,000 to general trade creditors. Moreover, it owed the bank $530,000, secured by the February 11, 1972, security agreement, and was in default on these loans. Vulcan-Cincinnati's employees were terminated, as there were insufficient funds to maintain the payroll. Following that, on May 12, 1975, the bank stepped in and took possession of Vulcan-Cincinnati's assets.

Charles Rydell, an officer of the bank, was the agent of all secured parties for the purpose of protecting the assets of Vulcan-Cincinnati. Rydell's highest offer for these assets came from one A. M. Kinney of defendant Process Installations, Inc. On June 2, 1975, an agreement was entered into between the bank, Vulcan-Cincinnati, Allstates, and Process Installations whereby the latter purchased all of Vulcan-Cincinnati's assets for $75,-000. Pursuant to this agreement, the bank assigned the 1970 lease covering the Northport property to Process Installations. Process Installations also requested, and received, an assignment of this lease to it by Vulcan-Cincinnati. Process Installations then proceeded to occupy the facility at Northport and sent Wentworth a notice of intent to exercise the option to purchase which had been included in the 1970 lease. An anti-assignment clause had also been incorporated in that lease, and Wentworth invoked it in suing for possession of the property.

Following a bench trial, the circuit court con-

cluded that the 1970 lease was valid, despite the
fact that Shirley Wentworth did not sign the lease
and the fact that the property was owned by both
plaintiffs as tenants by the entireties. The trial
court further found that, despite the anti-assign-
ment clause in the lease, the lease was effectively
assigned by operation of law, because it was em-
braced by the security agreement which had been
defaulted on by Vulcan-Cincinnati. An alternative
justification advanced by the court for its finding
that the lease was legally assigned was that, by
pledging the leasehold interest to secure financing
for the corporation of which he was chief executive
officer, Wentworth had consented to its assign-
ment. The court concluded that defendant Process
Installations was properly in possession of the
premises. Having resolved the issue of which party
was properly entitled to possession of the premises,
the trial court turned to the other issue surround-
ing Process Installations' purported exercise of the
option contained in the lease. This option provided
that the purchaser would pay the fair market
value of the premises at the time of the exercise of
the option. The question before the court was
whether this amount would include the value of
the buildings constructed by Vulcan-Cincinnati on
the leasehold premises during the 1960's.

The court found that the option was valid de-
spite the fact that Shirley Wentworth did not sign
the lease, as under the circumstances Theodore
Wentworth acted as the authorized general agent
of Shirley Wentworth in signing the lease agree-
ment. Treating the issue as a matter of the intent
of the parties at the time the lease was executed,
the trial court determined that the buildings and
fixtures became part of the lessor's interest. As a
result, the court held that the fair market value

for purposes of the option should include both the land and the buildings.

The trial court's finding that Shirley Wentworth was bound by the terms of the lease executed by Theodore Wentworth was correct. The court noted that she generally left the operation of the Northport property to her husband. Furthermore, although she did not sign the lease, she signed the agreement with the creditors' committee which extended the term of the lease. This was a definite step toward the lease of the property. See *Eadus v Hunter,* 249 Mich 190; 228 NW 782 (1930). More nearly on point is *Schram v Burt,* 111 F2d 557, 562 (CA 6, 1940). That case involved a mortgage, executed by the husband alone, upon property belonging to the husband and wife by the entireties. The *Schram* court would not hold that the husband had authority to enter into a contract on his wife's behalf merely from the fact of their relationship. However, the court stated: "The contract of the husband is binding upon the wife whenever he is shown to have been invested with the power of a general agent with regard to the management of the property or the subject matter of the contract."

Thus, because Mr. Wentworth was the general agent for Mrs. Wentworth, who admittedly knew nothing about the business and acquiesced in all of her husband's business decisions, the trial court correctly concluded that the lease and option were valid.

However, the decisive issue in this appeal is raised by plaintiffs in their cross-appeal. Plaintiffs claim that the anti-assignment clause in the 1970 lease prohibited the assignment to Process Installations without their written consent. We agree. The trial court erred in concluding that the lease-

hold interest was to be regarded as personalty rather than a real estate interest. With the leasehold interest treated as chattel property, the trial court had no difficulty in upholding the manner in which the bank took over the asset and subsequently assigned it to Process Installations. *Crouse v Mitchell,* 130 Mich 347; 90 NW 32 (1902), was referred to as procedurally analogous. The trial judge articulated his belief that, if the leasehold was looked upon as real estate, it was not effectively foreclosed upon:

"There was no judicial foreclosure of the lease assignment in issue, and no recognition of the debtor's exclusive right of possession as part of an equity of redemption pending foreclosure. If the security instrument were viewed as a real estate mortgage, there can be no question that there has been no effective foreclosure."

It is ironic that the trial court, which relied so extensively on *Crouse v Mitchell,* seems to have ignored a significant part of it. Construing several statutory provisions, one of which originated two years after the case of *Grover v Fox,* 36 Mich 453 (1877), relied on by the trial court, the *Crouse* Court held that a leasehold interest which has an unexpired term which exceeds three years is real estate for the purposes of recording laws and levy procedures. *Crouse v Mitchell, supra,* pp 356-357. See MCL 600.6057; MSA 27A.6057; MCL 565.35; MSA 26.552.

In *Crouse* a lessee executed an assignment of his interest in a lease as security for a debt. The first issue before the Court was whether the assignment or pledge of the lease as security in good faith was a violation of a clause in the lease against assignment. The Court decided that the lease was not violated by such an assignment. The

second question, regarding which of two mortgages had priority, required the Court to decide, as it did, that the conveyance was such an interest in land as to make the real estate recording laws applicable to it. More critically, it must be noted that the action in *Crouse* was a bill by the assignees under the security agreement to foreclose a lien upon a leasehold interest. The defendants had argued that the assignment was void as to them, because the leasehold interest was a chattel real, which had to be sold as a personal estate and could only be seized on execution as a chattel interest. The defendants claimed the assignment was, therefore, ineffectual by reason of the failure to file with the city clerk as provided by statute. The Court found that the instrument was properly filed in accordance with the real estate recording laws and held for the plaintiffs.

Although at common law leasehold interests were identified as a chattel real and considered to be personal property, Michigan law recognizes leasehold interests as being a classification of real property. *Fidelity Trust Co v Wayne County,* 244 Mich 182; 221 NW 111 (1928); *Crouse v Mitchell, supra.*

Because the leasehold is to be considered real property, and the trial court noted that the leasehold was not properly foreclosed upon, Process Installations did not receive a valid assignment and hence is not properly in possession of the Northport property. Also, because the property was not properly foreclosed upon, the trial court's alternative finding that Mr. Wentworth impliedly consented to the assignment by using the property as collateral cannot overcome the defective procedures employed by the bank.

In light of the foregoing disposition, we find it

necessary to discuss the question of whether the buildings and improvements erected by defendant Vulcan-Cincinnati on the Northport property during the first lease became part of the leased premises when the second lease was executed.

The buildings constructed by Vulcan-Cincinnati were trade fixtures. As defined by this Court in *Michigan National Bank, Lansing v Lansing,* 96 Mich App 551, 555; 293 NW2d 626 (1980):

"A trade fixture is merely a fixture which has been annexed to leased realty by a lessee for the purpose of enabling him to engage in a business. The trade fixture doctrine permits the lessee, upon termination of the lease, to remove such a fixture from the lessor's real property."

As such, the trade fixture is considered to be the personal property of the lessee. A chattel is a trade fixture if devoted to a trade purpose, regardless of its form or size. *Waverly Park Amusement Co v Michigan United Traction Co,* 197 Mich 92; 163 NW 917 (1917). See also *Wycoff v Garriloff Motors, Inc,* 362 Mich 582; 107 NW2d 820 (1961).

The policy behind the above postulates, as expressed in *Cameron v Oakland County Gas & Oil Co,* 277 Mich 442, 552; 269 NW 227 (1936), is significant to the determination of this appeal:

"The right of the tenant to remove the erections made by him in furtherance of the purpose for which the premises were leased is one founded upon public policy and has its foundation in the interest which society has that every person shall be encouraged to make the most beneficial use of his property the circumstances will admit of. * * *

"The reason property of this kind is personal, rather than real, is based upon the rule the law implies an agreement that it shall remain personal property from

the fact the lessor contributes nothing thereto and should not be enriched at the expense of his tenant when it was placed upon the real estate of the landlord with his consent. There is no unity of title between the owner of the land and the owner of the structures, and the buildings were not erected as permanent improvements to the real estate, but to aid the lessee or licensee in the use of his interest in the premises."

Against this background we shall examine the effect of a second lease on the trade fixture doctrine.

Plaintiffs claim that in *Kerr v Kingsbury,* 39 Mich 150 (1878), the Supreme Court recognized that a new lease set forth a completely new arrangement, effectively terminating whatever rights of removal a tenant had under the original lease. This is incorrect. Under *Kerr,* continued possession by the lessee maintains, rather than forfeits, his right to retain trade fixtures, provided a renewal lease does not make contrary declarations or a contrary intent is otherwise inferable.

Some confusion in Michigan law was generated by certain language in *Waverly Park Amusement Co v Michigan United Traction Co, supra.* The facts of that case are so unique and so complex that it is useless to attempt to compare it with the instant case, but the following statements, adopted by the Supreme Court from the lower court opinion, were considered controlling by the trial court:

" 'The rule is different in some of the States, but Michigan does not hold that trade fixtures pass to the landlord or become a part of the realty until the lessee surrenders his right of occupancy, and if that right does not end with one lease, but is continued under renewals by way of new leases, *having practically the same kind of tenancy in view,* he may wait until his agreed use of such fixtures is near an end and remove his fixtures at

any time before the expiration of the leased right of occupancy.' " 197 Mich 95-96. (Emphasis supplied.)

While older property law cases are often susceptible to a variety of interpretations, in our opinion a fair reading of these cases indicates that forfeiture is not to be presumed, despite the above reference to "practically the same kind of tenancy". Recalling the rationale behind the trade fixture doctrine, as expressed in *Cameron v Oakland County Gas & Oil Co, supra,* that a lessor should not be enriched at the expense of his tenant, we find the rule of *Kerr* and *Waverly Park* to mean that trade fixtures remain the personal property of the lessee as long as the lessee remains in legitimate possession of the property unless: 1) it is expressed or clearly implied in a second lease, executed after the term in which the fixtures were erected, that the fixtures belong to the leasehold, or 2) such a fundamental change in the nature of the tenancy has occurred that it would not unjustly enrich the lessor to include the fixtures as a permanent part of his real property.

It is not disputed that Vulcan-Cincinnati, as successor to Chemical Processes by merger, remained in possession of the property until 1975. The first clause of the 1970 lease following recitations of the parties provides that at least one of the buildings was to be included in the leasehold estate. But Exhibit A of the lease, purporting to be a more complete description of the leased premises, makes no mention of the buildings. Other documents and testimony demonstrate that the intent of the parties was that the buildings and improvements were personal property of the lessee, Vulcan-Cincinnati.

The second part of the Michigan test is whether there was such a significant change in the charac-

ter of the tenancy that no forfeiture would result
from consideration of the buildings as part of the
leasehold. This question does not turn on whether
or not the 1970 and 1962 leases contained approxi-
mately the same terms. The two leases were
drafted by two different attorneys and are differ-
ent in several respects. But it is not dispositive
that the second lease does not include a provision
allowing the lessee to remove fixtures at the end of
the leasehold. For example, in *Daly v Simonson,*
126 Iowa 716; 102 NW 780 (1905), the tenant did
not forfeit his right to remove fixtures reserved to
him under the original lease by taking a new lease
containing no reservation of the right to remove
the fixtures but providing instead that the lessee
should protect the buildings and improvements.

Plaintiffs' best argument in this regard is that,
in effect, there was a de facto change of lessees.
Prior to execution of the 1970 lease, Theodore
Wentworth had been a majority stockholder of
Vulcan-Cincinnati; after the 1970 lease Wentworth
owned only 35% of the stock in that company. But
under the circumstances of this case, we believe
that a forfeiture would still occur if the 1970 lease
were held to include the buildings as part of the
leasehold. The same corporate entity, Vulcan-Cin-
cinnati, was lessee before and after the 1970 lease.
As part of the 1970 deal, Allstates gave, and
Wentworth received, valuable consideration in ex-
change for a majority stock position. The new
lease was central to this agreement, which, among
other consideration, relieved Mr. and Mrs. Went-
worth of the debenture guarantee. Moreover,
Wentworth was still the chief executive officer of
Vulcan-Cincinnati. It is obvious from a reading of
the trial transcript of Wentworth's testimony that
he was still intimately involved with Vulcan-Cin-

cinnati even after his loss of majority stock control. For example, in 1975, with foreclosure by the bank near, Theodore Wentworth was still out looking for fresh capital sources for his company. Taking these circumstances into account, we would conclude that it would be unfair to hold that in 1970 the buildings and improvements suddenly ceased to be the personal property of Vulcan-Cincinnati. The nature of the tenancy simply had not undergone so radical a transformation.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.